[No. 2301]

## M. B. MOORE AND ROBERT H. YOUNG, RESPONDENTS, *v.* ROCHESTER WEAVER MINING COMPANY (A CORPORATION) AND F. M. SCHICK, APPELLANTS.

[174 Pac. 1017]

1. ESTOPPEL—ELECTION OF REMEDIES—CLAIM UNDER OR AGAINST CONVEYANCE.
    Where one has an election either to ratify or disaffirm a conveyance, he can either claim under or against it, but he cannot do both, and, having adopted one course, he cannot afterwards pursue the other.

2. ESTOPPEL—UNAUTHORIZED SALE—CONFIRMATION BY OWNER.
    Where one without title or authority from real owner assumes to sell and convey land in fee, and true owner, knowing facts, consents to and accepts proceeds of sale in satisfaction of his interest, he cannot thereafter assert his legal title as against buyer.

3. ATTORNEY AND CLIENT—DEALING WITH CLIENT—PRESUMPTION OF FRAUD.
    Where attorney deals with client for his own benefit, transaction is not only regarded with suspicion, and closely scrutinized, but it is presumptively invalid for constructive fraud, a presumption to be overcome only by the clearest evidence.

4. ATTORNEY AND CLIENT—EXACTION OF ADDITIONAL COMPENSATION.
    Where an attorney, with the work he is required to do under his contract partially performed, exacts from his client an additional compensation under threat of withdrawing from the case, nothing but the best of reasons are sufficient to uphold the agreement.

5. EVIDENCE—INTENT—CONCLUSIVENESS OF TESTIMONY.
    Though intent is a matter of fact that ordinarily may be testified to by the person whose intent is in question, if the reason for the motive is equivocal, it is not conclusive as against presumptions and inferences equally as credible.

6. QUIETING TITLE—AID OF LEGAL TITLE—BURDEN TO ESTABLISH.
    Where one comes into equity seeking equitable relief in aid of a legal title, he must first establish such legal title; and where it is doubtful the court will not grant the relief.

7. ESTOPPEL—RATIFICATION OF CONVEYANCE—ACCEPTANCE OF PROCEEDS—SUFFICIENCY OF EVIDENCE.
    In action to quiet title to undivided interest in mining claims, evidence *held* to show plaintiffs were prevented from asserting legal title as against title of defendant company after having ratified their grantor's acts in conveying to defendant by accepting from him half of proceeds of sale of property by him.

8. APPEAL AND ERROR—PRESUMPTION AGAINST TRIAL COURT—FIND-
    INGS.

    Fact that trial court refused to find as requested, not show-
ing court did not find at all, and record not affirmatively
showing court either failed or refused to follow practice act,
supreme court will not presume against regularity of proceed-
ings of trial court as to findings.

9. APPEAL AND ERROR—HARMLESS ERROR—FAILURE TO FIND AS
    REQUESTED.

    Appellant company *held* not prejudiced by trial court's
refusal to find as requested, especially in view of exhaustive
decision covering all issues, and additional finding, made
before motion for new trial was disposed of, in conformity to
particular issues of title to property in suit made by complaint
and cross-complaint.

APPEAL from Sixth Judicial District Court, Humboldt
County; *Edward A. Ducker,* Judge.

Action by M. B. Moore and Robert H. Young against
the Rochester Weaver Mining Company, a corpora-
tion, and F. M. Schick. From judgment for plaintiffs,
defendants appeal. **Reversed, and cause remanded,**
COLEMAN, J., dissenting in part.

*Hoyt, Gibbons & French* and *H. J. Murrish,* for Appel-
lants:

The respondents, by reason of having received the
$2,500, the sum being one-half of the purchase price
paid by Schick to Olson for all of the latter's interest in
the Weaver group, thereby estopped themselves from
denying the appellants' title. "It is well settled that a
person shall not be allowed at once to benefit by and
repudiate an instrument, but, if he chooses to take the
benefits which it confers, he shall likewise take the
obligations or bear the onus which it imposes." Alex-
ander v. Winters, 24 Nev. 146; Marye v. Martin, 9 Nev.
28. "One who has accepted the benefits of an invalid
contract is estopped from asserting its invalidity." Sage
v. Finney, 135 S. W. 996; Hilton v. Meier, 100 N. E. 962;
Hector v. Warren, 124 S. W. 1119; McCormick v. Unity
Co., 87 N. E. 924; Barnes v. Vandiver, 62 S. E. 994;
Keel v. Jones, 47 So. 385; Grooms v. Mullett, 113 S. W.

683; McCoy v. Niblick, 70 Atl. 577; Dunham v. Milhous, 70 Ala. 596; Seymour v. Lewis, 78 Am. Dec. 108; Sutton v. Baldwin, 58 N. E. 335. "When the owner of land stands by and sees another sell it, or the minerals therein, and says nothing, and especially when he receives a part or all of the purchase money, he will be estopped to thereafter claim the property." Manning v. Kansas Coal Co., 81 S. W. 140; Hunt v. Wright, 139 S. W. 1007; Hawks v. Smith, 81 S. E. 200; Jones v. Langhorne, 34 Pac. 997. "Where one having the right to accept or reject a transaction takes and retains benefits thereunder, he becomes bound by the transaction and cannot avoid its obligations or effect by taking a position inconsistent therewith." 16 Cyc. 787. "A party cannot apply to his own use that part of the transaction which may bring to him a benefit and repudiate the other which may not be to his interest to fulfil." Heath v. West, 28 N. H. 108.

On failure of the trial court to find on the issues made by the pleadings in an action, the judgment must be reversed on appeal and the cause remanded for a new trial. "For a failure on the part of the court below to find on the issues made by the pleadings in the case, the judgment must be reversed and the cause remanded for a new trial." Conklin v. Stone, 6 Pac. 378. "There is no finding on the issue raised by the answer as to the averments in justification; the findings are silent upon this subject. Judgment and order reversed." Hawes v. Green, 3 Pac. 496. "It will not be disputed that a conflict of evidence does not deprive a party of the right to have a finding upon a material issue." Williams v. Pratt, 10 Cal. App. 625, 103 Pac. 151.

It is not sufficient that there is a conflict in the evidence, but such conflict must be a substantial conflict. State v. V. & T. R. R. Co., 23 Nev. 283.

*L. G. Campbell, R. H. Young,* and *M. B. Moore,* for Respondents:

Estoppel can operate only between parties to the transaction or their privies, and the party who pleads

an estoppel must be one who has acted in good faith
and who has been misled by the conduct of the party
whom he seeks to estop, to his injury.   Butler v.
Supreme Court of Foresters, 53 Wash. 125, 101 Pac.
481; 16 Cyc. 777.   Before a person can sustain a plea
of estoppel against another, he must have been informed
of the facts pleaded, and have relied upon them.   Chellis
v. Coble, 15 Pac. 506; 16 Cyc. 742, 770, 875; Bigelow
on Estoppel, 6th ed. 492, 732, 738, 745; Jacobs v. Miller,
50 Mich. 119.   "Before an estoppel can be raised there
must be certainty to every intent, and the facts alleged
to constitute it are not to be taken by argument or
inference."   16 Cyc. 748; Halbert v. De Bode, 15 Tex.
Civ. App. 615; Van Bibber v. Beirne, 6 W. Va. 168, 178;
Ware v. Cowles, 24 Ala. 446, 60 Am. Dec. 482; 11 Ency.
Law, 2d ed., 242.

There can be no estoppel by ratification against the
respondents, for the reason that there was no intention
on the part of respondents to adopt and be bound by
the acts of Olson.   "It must be clearly shown in order
to operate as an estoppel that the parties receiving the
money receive it, not only knowing of the facts, but
with the intention of ratifying the transaction, and not
for any other purpose."   Town of Ansonia v. Copper,
33 Atl. 905; Garbett v. Maye & Donovan, 52 Atl. 495;
Gunn v. Manhaska Co., 136 Atl. 929.

"Acts and declarations or silence to create an estoppel
in pais must be wilfully intended to lead the party set-
ting up the estoppel to act upon them."   Gardner v.
Pierce, 22 Nev. 146.   "Evidence of estoppel in pais
should be carefully scrutinized, as it is a dangerous
species of evidence, liable to abuse."   Davis v. Davis,
26 Cal. 24.

The law is well settled that where findings are suffi-
cient to sustain a judgment, failure to find on other
issues, which could not change the result, is harmless.
"It is perhaps hardly necessary to add that if the find-
ings actually made (which are sufficient to support the
judgment) were sustained by the evidence, the failure
to find upon additional issues, which could not affect the

result, would be entirely immaterial." Robinson v. Muir, 90 Pac. 521. "When the court finds in an action for trespass that the ownership was in defendant, a failure to find on affirmative defenses does not prejudice plaintiff." Murphy v. Bennett, 9 Pac. 738; Hutchings v. Castle, 48 Cal. 152; Daly v. Sorocco, 22 Pac. 211. "Judgment will not be reversed for failure to find on a material issue, which, if made, must be against appellant." White v. White, 23 Pac. 276; O'Connor v. Clarke, 44 Pac. 482; Bank v. Bank, 80 Pac. 820.

Findings on ultimate facts are all-sufficient, and therefore the court must have found the probative facts in favor of respondents. Chaffee-Miller Land Co. v. Barber, 97 N. W. 850; Fritchetts v. Victoria Land Co., 101 N. W. 655.

By the Court, SANDERS, J.:

This was an action to quiet title and to remove a cloud from the respondents' title to an undivided one-fourth interest in three contiguous lode mining claims, situate in the Rochester mining district, Humboldt County, Nevada, known as the "Weaver group."

The main question to be considered on this appeal is, whether the respondents by their acts and conduct are prevented from asserting their title to the property in controversy as against the appellant company, which claims title to the whole of the property in dispute.

The appellant company, by its answer, set up two equitable defenses, either of which, if sustained, constitutes a complete defense to the action. One was in form an affirmative defense, admitting the execution and delivery to the respondents of a deed purporting to convey to them an undivided one-fourth interest in the Weaver group, but that their said deed was obtained by fraud. The other was in form a separate and distinct defense, in substance and to the effect that the respondents knew at the time their title accrued that their grantor had, prior thereto, executed a deed conveying his entire interest in the premises to the appellant Schick, and with full knowledge of the material facts,

ratified the acts of their grantor by accepting from him one-half of the proceeds of the sale of the property.

Whether, upon the facts proved, a case was made upon which, according to the principles of equity, the respondents are prevented from asserting their legal title against the appellant company, is the real point in controversy. The point is important as between the parties, and still more important because it involves in its wider aspects a question affecting the security of all title to real property and a consideration of the circumstances under which a legal title may be practically subverted and lost, although the true owner has never executed any deed or conveyance of or any writing agreeing to convey his land. Thompson v. Simpson, 128 N. Y. 284, 28 N. E. 627. Such defense to an action of this character rests upon the plain principle of justice of right, and law, that a man cannot accept the benefits and reject the burdens of a transaction, and not upon any of the essential elements of estoppel in pais.

1. Where one has an election either to ratify or disaffirm a conveyance, he can either claim under or against, but he cannot do both. And having adopted one course, he cannot afterwards pursue the other. And it is wholly immaterial, of course, what may be the infirmities of the transaction abstractly considered; if he elects to take under it, he thereby cuts himself off from attacking it. It is good as to him, though it may be bad as to everybody else. Kahn v. Peter, 104 Ala. 531, 16 South. 524.

Upon this principle, the books abound with cases in which those who are entitled to avoid a sale, or to adopt and ratify it, or to claim under or in opposition to a conveyance, by accepting the proceeds of the sale, or the benefits of the conveyance, preclude themselves from avoiding it. Goodman v. Winter, 64 Ala. 434, 38 Am. Rep. 13.

2. The rule is, that where one, without title or authority from the real owner, assumes to sell and convey the land in fee, and the true owner, knowing the facts, consents to and does accept the proceeds of the sale in full.

satisfaction of his interest, this ought in equity to operate as a confirmation of the unauthorized sale, and preclude the real owner from asserting his legal title. The sale in the case supposed is treated as his act, or at least it operates in connection with the receipt of the purchase money as an agreement on his part to sell to the purchaser and as a payment by the latter to the true owner of the consideration. Thompson v. Simpson, supra.

The acts relied upon in this case as constituting ratification of the unauthorized acts of respondents' grantor are that the respondents, with full knowledge of all the material facts, accepted from him one-half of the purchase price of the property in controversy. To rebut the presumption and inference deducible from their act, the witness Moore, one of the respondents, testified that their intent and motive for accepting from their grantor a sum equivalent to one-half of the proceeds obtained by him from his unauthorized conveyance of the property was not to ratify or affirm the conveyance, but was demanded as and for an additional compensation for legal services to be performed as attorneys in behalf of their grantor in an action then pending between him and his grantee Schick, involving the former's title to other mining ground, and to support his statement the witness gave in detail an account of the transaction whereby respondents received from their grantor a sum equal to one-half of the proceeds of the sale of the property. From the testimony of this witness, and facts and circumstances connected with it, the trial court found, quoting from its decision, that:

"Moore's testimony in this regard is satisfactory, and from it the court concludes that plaintiffs' conduct in reference to the transaction did not amount to a ratification of Olson's acts in accepting $5,000 from Schick for his interest in the Weaver claims, and therefore does not constitute an estoppel."

The duty devolves upon us, at the expense of prolixity, to review the evidence upon which this finding is based, and determine if the evidence is such as to prevent the

respondents from asserting in equity their legal title against the appellant company.

One Olson, respondents' grantor, and one Schick, the appellant, were the owners of the Weaver group and other mining ground, situate in the Rochester mining district. Olson, on the 28th day of October, 1912, conveyed to Schick his undivided one-half interest in the Weaver group. The deed was placed in the First National Bank of Lovelock, with instructions to the bank, signed by both parties, to deliver the deed to Schick on the payment by Schick into the bank, to the credit of Olson, the consideration expressed in the deed, to wit, $5,000, according to the payments named in the instruction to the bank. Shortly after this transaction, Olson apparently became dissatisfied with the relationship existing between him and Schick, and on the 10th day of December, 1912, consulted his attorney, the respondent Young, concerning his legal rights in the premises. The witness Moore, upon solicitation of Young, participated in the conference, and as a result the following agreement or memorandum was signed by Olson:

" I hereby employ R. H. Young of Lovelock, and Stoddard, Moore, and Woodburn of Reno, Nevada, as my attorneys to represent me and my interests, and to take such action by suit or otherwise to secure for me the interest to which I am entitled in mining ground located in Rochester Canyon or vicinity in Humboldt County, Nevada, by F. M. Schick in our names jointly, or his, F. M. Schick's, or any claim located by him for any other person or persons, and being without funds to pay my said attorneys, I hereby agree to allow them as payment for said services to be rendered, and I do hereby agree with my said attorneys to pay over to them and transfer to them one-half ($\frac{1}{2}$) of all money or property which now stands in my name and said Schick's name or which they may secure for me from said Schick or any other person or persons or corporation by action, suit or in way of settlement with said Schick or any other person, persons or corporation."

Thereupon the respondents, with the authority and

consent of Olson, and over his signature, gave notice to the bank and to Schick of his rescission and repudiation of the deed of October 28, 1912, and caused to be posted a similar notice upon the ground in controversy, and thereafter notified all parties dealing with Schick for the purchase of the Weaver group of Olson's repudiation of the instrument, and also, on later dates, gave notice to others dealing with Schick of respondent's title to an undivided one-fourth interest in the property. On the 18th day of December, 1912, Olson executed, acknowledged and delivered a deed, at the request and solicitation of the respondent Young, conveying to the respondents an undivided one-fourth interest in the Weaver group, the Rochester group, the Crown Point Extension and the Weaver Extension lode mining claims. This deed was filed for record on the 23d day of December, 1912.

Pursuant to their employment, the respondents, on or about the 23d day of December, 1912, filed suit in the name of Olson v. Schick to establish Olson's undivided one-half interest in and to the Rochesters, the Crown Point Extension, and the Weaver Extension locations, and pursuant to their employment, on the 9th day of January, 1913, filed suit in the name of Olson v. Schick to annul the deed of October 28, 1912, on the ground of fraud and deceit, and also filed contemporaneously therewith notice of lis pendens, and on the 20th day of January, 1913, filed an amended complaint in the cause, all the pleadings being verified by Olson.

Olson, without the knowledge of the respondents, and after he had been advised and instructed not to accept any money from Schick on account of the transaction with him in connection with the Weaver group, had actually on or about the 6th day of January, 1913, and before the filing of the suit to cancel his deed to Schick of the Weaver group, accepted the sum of $1,000 on the purchase price of the property; and, without the knowledge of respondents, on or about the 13th day of January, 1913, Olson was paid the remaining sum of $4,000

in accordance with the escrow instructions accompanying the placing of the deed in the bank, and, without their knowledge or consent, the deed was delivered by the bank to Schick on the 12th day of January, 1913. On or about January 30, 1913, upon discovering for the first time that Olson had accepted the said sum of $5,000, they procured an interview with him, and learned from him that he had accepted the said sum in full satisfaction of all of his right, title, and interest in and to the Weaver group from appellant Schick, and learned, from some source not disclosed by the record, that Olson also had signed an agreement ratifying a deal which Schick had made with third parties for the Crown Point Extension, and learned also, from some source not disclosed by the record, that Olson had been negotiating with Pitt and McIntosh, who held a contract from Schick, for the five original Rochester claims; all of which mining ground formed the basis of the suit pending to establish Olson's one-half interest in those particular properties.

The testimony of the witness Moore bearing directly upon the transaction concerning the demand and payment of a sum equal to one-half of the purchase price received by Olson from the sale of the Weaver group is as follows:

"We went to Young's Hotel, where he was, and asked him to come to the office; we wanted to see him. He came to the office, and I said to him, 'Nelse, have you taken that $5,000 from the bank?' He said, 'No.' I said, 'I am informed that you have,' and repeated my question. And then he said, 'I did.' I said, 'Why did you take it?' 'Well,' he said, 'a friend of mine told me it was over there, and I might just as well take it down.' I said, 'Do you know what you have done by taking that money?' He said, 'No.' I said, 'You have forfeited all claim that you had to the Weaver property, and you have no chance whatever to recover on account of the suits you have brought.' I said, 'When did you get this money?' He said, 'About two weeks ago.' I said, 'You

had this money when you filed this last complaint?' He
said, 'I did.' I said, 'Who told you to take this money
down?' He said, 'A friend of mine, and I don't want to
tell you who it was,' or something to that effect. 'They
told me I might as well take this money as not, and that
I wouldn't affect my suit against the Weavers.' I said,
'As far as you are concerned you are out of the Weavers,
but it hasn't and won't affect Mr. Young and myself.'
I said: 'Nelse, it seems to me that you haven't played
fair with us. You have permitted us to commence this
action and prosecute it after you had taken the money,
and you have kept it from us all this time. You have
also permitted us to commence an action on your grub-
stake contract,' which we had commenced.   *   *   *   I
said, 'You have signed an agreement with Farris and
Organ to ratify any deal they might make with Mr.
Schick, and you have been flirting with McIntosh and
Pitt, and you are placing this other suit in such a con-
dition that it is making our work much harder for us,
and if you continue it will be impossible for us to be
successful, and I am not going on with this litigation
under present circumstances, and in order for me to go
on with your litigation you will have to pay me for it,'
to which he made some objection. I said, 'On account of
your conduct you cannot be relied upon, and the first
thing we know we will be entirely out of our contingent
fee on the Crown Point Extension, Rochester Extension,
and Weaver Extension.' And he wanted to know how
much we wanted, and I said, 'Twenty-five hundred
dollars.' He demurred to that at first, but finally said,
'All right; the money is in the bank.' And we went to
the bank, and the money wasn't there at that time, we
were informed. So we came outside of the bank, and
he said he would get it. Mr. Young and I went back to
Mr. Young's office, and in the course of an hour, I think
it was, Mr. Olson came back with a check book which
hadn't any check taken out, and Mr. Young made out a
check, and Mr. Olson signed it. Mr. Young went to the

bank, and brought me back a certified check for $1,250, payable to Stoddard & Woodburn."

The respondents invoke the rule of conflict of testimony, and insist that we are precluded from disturbing the finding of the court on appeal because of this universal rule. We are unable to concur in this view, for the reason that it affirmatively appears from the finding that it is made to rest upon the uncontradicted testimony of the witness Moore, and was to the effect that the respondents' conduct did not amount to a ratification of Olson's act in accepting the $5,000 from Schick for his interest in the Weaver group, and therefore did not constitute an estoppel. The witness Moore is a lawyer of ability and high standing at this bar, and his testimony must be construed, scrutinized, and criticized in the light of the intellectual plane upon which the testimony of such witness is placed. The credibility of the witness is not in question, but the credibility of his testimony is. These terms are by no means equivalent. Without the slightest reflection upon the integrity or standing of the witness, his testimony may fail to win belief apart from any considerations definitely affecting the personality of the witness. 2 Moore on Facts, sec. 976. The witness Moore evidently felt the necessity of having to explain, or in some manner overcome, the presumption or inference standing in opposition to his statement that respondents actually received, with knowledge of all the material facts, one-half of the proceeds obtained by Olson for the conveyance. The reasons assigned by the witness for his act were apparently satisfactory to the trial court. In its decision it states:

"The reasons given by Moore, for exacting further compensation from Olson, namely, that by his action he had involved and rendered more difficult their work in the litigation undertaken in his behalf, was sufficient to justify them in that course."

The testimony does not so impress us; on the contrary, it is far from being satisfactory. We do not doubt

that the witness conscientiously felt that respondents, in view of their contingent fee and their client's conduct, were justified in exacting from him all that the "traffic would bear"; that is to say, one-half of what Olson received from Schick for the Weaver group, and still hold a one-fourth interest in the Weaver group, one-half of the stock recovered in the suit involving the other properties, and also one-half of Olson's interest under the contract in all properties standing in the name of Schick in which Olson had an interest. But it is our view that the relationship of the parties existing at the time of the transaction weakens the testimony, and that the reason or explanation for their act is not conclusive as against the facts and circumstances in opposition to it. The respondents knew the material facts; they demanded just one-half of what their grantor received for his interest; the demand was coincident in time with the receipt of the money by Olson, and the sum thus demanded and received would give to them a much larger fee than that agreed upon in their written contract with Olson.

3, 4. No principle has been so rigidly adhered to by the courts of this country and England than that, where an attorney deals with his client for the former's benefit, the transaction is not only regarded with suspicion and closely scrutinized, but it is presumptively invalid on the ground of constructive fraud, and that this presumption can be overcome only by the clearest and most satisfactory evidence. The rule is founded in public policy, and operates independently of any ingredient of actual fraud, being intended as a protection to the client against the strong influence to which the confidential relation naturally gives rise. Thomas v. Turner's Admr., 87 Va. 1, 12 S. E. 149, 668; Elmore v. Johnson, 143 Ill. 513, 32 N. E. 413, 21 L. R. A. 366, 36 Am. St. Rep. 401. It is said in a leading case that:

"Integrity of character and purity of motive have never enabled such contracts to stand in full force, against the principle of equity, which commonly excludes all inquiry into the fairness of the transactions, and sets

them aside, as violations of the policy of justice." Lecatt v. Sallee, 3 Port. (Ala.) 115, 29 Am. Dec. 249.

We do not go to the extent of this case and hold that such an agreement is invalid and cannot be enforced. The weight of authority does not go that far. But where an attorney, with the work he is required to do under his contract partially performed, exacts from his client an additional compensation under a threat of withdrawing from the case if the agreement was not made, nothing but the best of reasons would be sufficient to uphold the agreement. Bolton v. Daily, 48 Iowa, 348. The reason given by respondents as the consideration for exacting an additional fee is but a loose statement that respondents had learned that their client had been dealing with his adversary Schick, and with third parties concerning the sale of the property involved in other litigation. In what respect this conduct rendered their duties more burdensome under their continuous contract of employment is a matter of pure conjecture and speculation. Ordinarily such conduct, in the absence of other evidence, might tend to lessen rather than increase their labor, as the dealings complained of might be construed as a recognition by Schick and others of Olson's interest in the property which the litigation sought to establish. It is difficult to see how such conduct would render their labor so much harder as to justify the respondents in making a threat to withdraw from Olson's litigation if the sum demanded of him was not paid. It is, however, readily perceived how Olson's conduct if persisted in might in a measure complicate the collection of their contingent fee. But it appears that prior to the institution of this suit the respondents had received all that was coming to them under their contract with Olson. It is true Olson appears to have been exceedingly changeable in humor and inconsistent in his acts, but the trial court characterizes Olson as being a laboring man, and, depending solely thereon for a livelihood, without previous experience in business affairs or legal matters, he became unexpectedly precipitated into litigation, with the prospects of losing or acquiring what to him seemed a

considerable sum of money, an amount not exactly "beyond the dreams of avarice," but still a substantial sum to a man in his situation in life.

We are impressed from the anxiety evinced on the part of respondents to protect themselves at every stage of the proceedings against the pitfalls or temptations that might overcome their client, that they must have had in mind just such a situation as that which confronted them at the time they first learned that Olson had received $5,000 for his interest in the Weaver group. They recorded their deed and gave, to all parties dealing with Olson and Schick for the purchase of the Weavers, notice of their interest therein. They may have been justly entitled under their contract to one-half the sum of $5,000, but they could not, knowing the facts, take and appropriate it to their own use and then attack the deed for which the said sum had been received by their grantor.

5, 6. It is true that intent is a matter of fact that ordinarily may be testified to by the person whose intent is in question, but if the reason for the motive is equivocal, it is not conclusive as against presumptions and inferences equally as credible. We take it that, where the latter are convincing or persuasive, evidence equally strong is necessary to relieve the parties of the prejudicial effect of the presumptions or inferences. The mere statement of an intent based upon a reason that does not support it certainly is not evidence of such a character as is necessary to overcome the presumption standing in opposition to it. We are here called upon to lay down a rule that affects all title to real estate, and are mindful that: Where one comes into a court of equity seeking equitable relief in aid of a legal title, the party must first establish his legal title, and where the latter is doubtful the court will not grant the relief. Low v. Staples, 2 Nev. 209; West v. Schnebly, 54 Ill. 523; Huntington v. Allen, 44 Miss. 654; Sanford v. Cloud, 17 Fla. 568; Story's Eq. Jur. (12th Ed.) 700, note.

7. From all the evidence we are impelled to conclude

that the respondents by their own showing are prevented from asserting their legal title to the premises in controversy as against the title of the appellant company, and that the finding of the trial court is not warranted by the evidence.

The principal point made on the appeal from the judgment is that the findings do not support the judgment, in that the court refused to correct or modify its findings as requested by the appellant company, and that there is an entire want of findings upon its defenses, and the judgment is "against law."

8. The fact that the court refused to find as requested does not show that the court did not find at all, and as the record does not affirmatively show that the court either failed or refused to follow the practice act, we will not indulge in presumptions against the regularity of the proceedings of the trial court in this particular. Schwartz v. Stock, 26 Nev. 143, 65 Pac. 351.

It is universally held that, where the system of express findings prevails, if the court fails to make findings on every material issue it constitutes reversible error. But Nevada is not classed as one of those states where such system prevails. Haynes, New Trial and Appeal, sec. 238.

The authorities cited by counsel for the appellant company from California have been heretofore answered by this court in the case of Dutertre v. Shallenberger, 21 Nev. 509, 34 Pac. 450, where the court said that:

"Under the present California system, the express findings must support the judgment, and, if they do not, the case will be reversed; but with us there is an implied finding in favor of the judgment, of all facts properly pleaded."

This court has also held that, where a judgment is rendered for plaintiff upon certain findings in his favor without reference to the findings of fact upon certain issues raised in defendant's answer, it will be presumed that such findings were found. More v. Lott, 13 Nev. 376; Langworthy v. Coleman, 18 Nev. 440, 5 Pac. 65.

**9.** We are of the opinion that the appellant company was not prejudiced by the court's refusal to find as requested, especially in view of the able and exhaustive decision covering all of the issues, and the additional finding made before the motion for a new trial was disposed of in conformity to the particular issues of title to the property made by the complaint and cross-complaint. Section 5227 of the Revised Laws, as amended by Stats. 1915, p. 218.

The appeal from the order making the Rochester Mining Company a party defendant after the cause was tried on its merits is not discussed, and we pass no opinion thereon.

The judgment is reversed, and the cause is remanded.

McCARRAN, C. J.: I concur.

COLEMAN, J., dissenting in part:

I concur in the order, but for reasons other than those assigned in the foregoing opinion. The complaint in the action is in the usual form to quiet title to real estate. The answer denies certain allegations of the complaint, and sets up an affirmative defense, wherein certain facts are alleged which, it is contended, estop the plaintiffs from asserting title to the property in question. The case was tried before the court without a jury. The court made findings of fact sustaining the allegations of the complaint, but made no finding as to the affirmative defense of estoppel, though specific request was made therefor by counsel for defendants, and exceptions were taken as provided by our statute to the refusal of the court to make such findings.

In my opinion, the action of the court in refusing to comply with the request and make findings upon such plea of estoppel justifies a reversal of the judgment. It is insisted by respondents that it necessarily follows from the general finding sustaining the allegations of the complaint that the court made a finding upon the affirmative plea of estoppel pleaded by the defendants. While it is a well-recognized rule of law in Nevada that,

where there is no special finding, and only a general finding in favor of a party, the finding will be construed on appeal so as to sustain the judgment, still, where the losing party requests specific findings upon an issue, and the court refuses to make findings thereon, nothing can be presumed in favor of the findings so made, and it is the duty of the appellate court to reverse the judgment. In my opinion, the defendants were entitled to a finding upon the affirmative defense of estoppel, that this court might determine if the law was properly applied to the facts found. I think my view is amply sustained by prior decisions of this court. In Warren v. Quill, 9 Nev. 259, it is said:

"Each party is undoubtedly entitled to a finding upon every issue raised that is essential to the determination of the case, and the findings ought always to contain a concise statement of each specific essential fact established by the evidence; but this duty is not made obligatory upon the court unless the proper steps are taken by counsel."

What are the proper steps alluded to in the quotation just given? Clearly, a specific request for a finding upon the issue upon which there is no finding. In the case of Welland v. Williams, 21 Nev. 230, 29 Pac. 403, the court says:

"If all the issues in the case have not been covered, findings upon the omitted points may be requested, when it will become the duty of the court to supply them. Hathaway v. Ryan, 35 Cal. 191. If not so requested, the judgment will not be reviewed upon that point (Warren v. Quill, 9 Nev. 259), unless it be upon an assignment of error that the evidence does not support, or is contrary to, the implied finding. More v. Lott, 13 Nev. 377."

Nor do I think that the case of Dutertre v. Shallenberger, 21 Nev. 507, 34 Pac. 449, cited in the opinion of the court, is contrary to the view which I have expressed; for, while it is said in that case that "with us there is an implied finding in favor of the judgment," the court also says that "there was no exception upon the ground that

the findings were defective or for want of a finding upon this point." This statement clearly shows that the court was not dealing with a situation such as is presented in this case. In that case the court likewise says:

"If then, we should admit that the findings as found in the transcript are upon this point insufficient to support the judgment, in the absence of all exceptions to them, we must imply a finding."

Thus we see that the court will imply a finding only in the absence of exceptions. In the case at bar there was not only an exception, but a request for specific findings. To take any other view than that which I have expressed would, it seems to me, be to overturn the decisions of this court and violate the spirit of section 5345, Rev. Laws, which reads:

"In cases tried by the court without a jury, no judgment shall be reversed for want of a finding, or for a defective finding of the facts, unless exceptions be made in the court below to the finding, or to the want of a finding; and in case of a defective finding, the particular defects shall be specifically and particularly designated; and upon failure of the court below to remedy the alleged error, the party moving shall be entitled to his exceptions, and the same shall be settled by the judge as in other cases.   *   *   *"

In my opinion, the case of Schwartz v. Stock, 26 Nev. 143, 65 Pac. 351, is not in conflict with the views which I have expressed. The court says:

"An unanswerable reason exists which justified the trial court in refusing to make the findings of fact after judgment, as requested by the appellant. The section of the practice act above quoted does not authorize any such practice, and we have been unable to find any other provision which does. If the court did not make the findings required by the section quoted, or had made defective findings, the appellant had ample remedy, under the requirements of another section, to correct the action of the court in the premises, and, in case of refusal to make the correction, the matter could have

been, by following the plain directions of the statute, presented to us for review. Section 2 of an act to regulate appeals in the courts of justice in this state (Comp. Laws, 3858) expressly prescribes the method of presenting such matters to the appellate court. It provides that, in cases tried by the court without a jury, no judgment shall be reversed for want of findings or for a defective finding of fact, unless exceptions be made in the court below to the finding or to the want of finding, and, in case of defective finding, the particular defects shall be particularly and specifically designated; and, upon failure of the court below to remedy the alleged error, the party moving shall be entitled to his exceptions, and the same shall be settled by the judge as in other cases. It further prescribed the time within which such exceptions shall be filed. The record does not show that there was a want of finding or defective finding; neither does it show that any of the steps required by the statute were taken to correct any want of findings or defective findings, or that any exception or other action was taken in the matter further than is indicated above. This matter has been before this court, considered, and determined, and, under the cases presented and decided, we must hold that the appellant's claim is without merit. McClusky v. Gerhauser, 2 Nev. 52, 90 Am. Dec. 512; Whitmore v. Shiverick, 3 Nev. 312; State v. Manhattan Co., 4 Nev. 336; Warren v. Quill, 9 Nev. 263; Welland v. Williams, 21 Nev. 230, 29 Pac. 403."

But it is nowhere urged by counsel for respondent that the rule which I contend for and which is urged by appellant, both upon oral argument and in the brief, is not the law of this state, but it is said that the case does not fall within the rule, and reliance is had upon the case of Daly v. Sorocco, 80 Cal. 367, 22 Pac. 211, and the case of Murphy v. Bennett, 68 Cal. 528, 9 Pac. 738, to sustain their contention. There is nothing in those cases in conflict with the rule invoked. The decision in each of those cases was in favor of the defendant, and all that was necessary to defeat the plaintiff's recovery was a

finding against him upon the cause of action made by his complaint. To prevail he had to sustain the allegations therein contained. As was said in Murphy v. Bennett, 68 Cal. 528, 9 Pac. 738:

"There should be findings upon all the material issues in the case, but a judgment will not be reversed for want of a finding on a particular issue, where it is apparent that the failure to find on that issue is in no way prejudicial to the appellant."

In other words, if plaintiff failed to sustain the cause of action, he could not recover, and hence it was not necessary for the court in the case mentioned to make findings as to the affirmative matter pleaded in the answer; but in the case at bar, in which the court may have found the legal title to the property in question in plaintiffs, it was necessary that the court make findings of fact as to the plea of estoppel set up in the answer, that this court might apply the law to the facts so found and determine whether or not the plea of estoppel should be sustained.

Taking the view which I do, I have declined to consider the point urged in the opinion of the court as a ground for a reversal of the judgment, believing that to consider the merits of the case upon a point where there is no finding, though expressly requested, would be contrary, not only to the spirit of our statute, but to the well-established practice.